United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FLEXTRONICS INTERNATIONAL, LTD., and FLEXTRONICS INTERNATIONAL USA, INC.,

Plaintiffs,

v.

PARAMETRIC TECHNOLOGY, CORPORATION,

Defendant.

Case No.: C 13-0034 PSG

**ORDER GRANTING-IN-PART MOTION FOR PRELIMINARY INJUNCTION**

**(Re: Docket No. 18)**

Defendant Parametric Technology Corporation ("PTC") brings a motion for preliminary injunction against Plaintiffs Flextronics International, Ltd. and Flextronics International USA, Inc. (collectively, "Flextronics"). Flextronics opposes. After the court ordered limited expedited discovery for purposes of providing a more comprehensive record for the preliminary injunction hearing, both parties filed supplemental briefing. After considering the papers and arguments of counsel, the court GRANTS PTC's motion, but only IN PART. The court sets forth its reasoning below.

## I. BACKGROUND

Parametric Technology Corporation ("PTC") is a leading supplier of software tools and

related services used to automate the development of a product from its conceptual design through production.[1] Among the software products PTC offers are Pro/ENGINEER Wildfire, and its successor, CREO (collectively, the "Pro/ENGINEER Software"), and their collection of add-on software tools used to create 3-D computer models of designs in development.[2]

PTC owns seven United States copyright registrations (TX 6-033-668, TX 6-033-669, TX 7-110-970, TX 7-616-136, TX 7-590- 984, TX 7-632-291, and TX 7-632-395) associated with the Pro/ENGINEER Software.[3]

**A. The 1998 License Agreement**

On or about August 27, 1998, PTC and Flextronics entered into a "Customer Agreement for Licensed Products," pursuant to which Flextronics licensed the use of PTC's Pro/ENGINEER software (the "Licensed Product") under agreed-upon terms (the "1998 License Agreement").[4]

According to these terms, Flextronics is licensed to install and use PTC software "on the Designated Computer or Designated Network by Users."[5]

In terms of ownership, the 1998 License Agreement provides as follows:

> [Flextronics] acknowledges that PTC and its licensors are the sole owners of the Licensed Products and of any copies thereof, and of all copyright, trade secret, parent, trademark and other intellectual or industrial property therein.[6]

The 1998 License Agreement provides that Flextronics "shall not copy or otherwise reproduce the Licensed Product in whole or in part, except for such copying as is essential for

---

[1] *See* Docket No. 20 ¶ 2.

[2] *See id.*

[3] *See id.* at ¶ 3.

[4] *See* Docket No. 1, Ex. A.

[5] *See id.* at §§ 1.13, 4.

[6] *Id.* at § 5.1.



United States District Court
For the Northern District of California

archival and system recovery purposes."[7] Flextronics also acknowledged that "the ideas and the expressions thereof contained in the Licensed Products are confidential and proprietary information and trade secrets of PTC."[8] Flextronics agreed not to "alter or remove any copyright, trade secret, patent, trademark, proprietary and/or other legal notices contained on or in copies of the Licensed Products" and to "reproduce all such notices on or in all copies of the Licensed Products permitted to be made under this Agreement."[9] Flextronics further agreed it would "limit use of and access to the Licensed Products to Users" and to take "all reasonable steps to safeguard the Licensed Products and to ensure that no persons authorized to have access to the Licensed Products shall take any action in violation of this Agreement."[10]

The 1998 License Agreement provides that PTC has a right to audit Flextronics' systems as follows,

> To ensure Customer's compliance with the terms of this Agreement, PTC reserves the right to audit Customer's use of the Licensed Products during normal business hours on reasonable notice and Customer shall give PTC such access that it may require to perform such audit.[11]

If Flextronics breached the use, ownership, intellectual property rights, and non-disclosure provisions in sections four and five of the contract, the contract's "Enforcement Provision" would take effect:

> Because Customer's breach of any of its obligations under Section 4 or 5 [of the 1998 License Agreement] will irreparably harm PTC . . . and substantially diminish the value of the proprietary rights in the Licensed Products, Customer agreed that if it breaches any of said obligations, PTC shall, without limiting its other rights or remedies, be entitled to equitable relief (including, but not limited to, injunctive relief) to enforce Customer's

---

[7] *Id.* at § 5.2.

[8] *Id.* at § 5.3.

[9] *Id.* at § 5.4.

[10] *Id.* at § 5.3.

[11] *Id.* at § 4.

United States District Court
For the Northern District of California

obligations and to protect the proprietary rights of PTC and/or its licenses."[12]

**B. The 2005 License Agreement**

On or about August 25, 2005, PTC and Flextronics entered into a "PTC Customer Agreement for PTC Products," pursuant to which Flextronics licensed additional PTC software (the "2005 License Agreement").[13] The 2005 License Agreement provides that Flextronics "shall not permit any third party to . . . copy or otherwise reproduce the Licensed Products in whole or in part," except in certain limited circumstance and "to make a reasonable number of copies solely for back-up purposes (provided that any such permitted copies shall be the property of PTC and shall reproduce all PTC copyright, trade secret, patent, trademark, logo, proprietary and/or other legal notices contained in the original copy obtained from PTC)."[14] Under the terms of the 2005 License Agreement, Flextronics agreed that it would "not alter, remove, or obscure any copyright, trade secret, patent, trademark, logo, proprietary and/or other legal notices on or in copies of the Licensed Products."[15]

The 2005 License Agreement also provides PTC with an "Audit Right" as follows:

> To confirm Customer's compliance with the terms and conditions hereof, Customer agrees that PTC may audit Customer's use of the Licensed Products. Customer agrees to provide PTC access to Customer's facilities and computer systems, and to cooperation from Customer's employees and consultants, as reasonably requested by PTC in order to perform such audit, all during normal business hours, and after reasonable prior notice from PTC.[16]

The Audit Right includes reimbursement for the audit in certain circumstances:

> If an audit discloses that Customer has failed to comply with one or more terms and conditions of the Licenses, and such failure to comply could have in part or in whole been avoided by Customer having paid additional license fees to expand the scope of the License or Licenses . . . then Customer shall, in addition to paying the unpaid fees, also reimburse

---

[12] *Id.* at § 13.

[13] *See* Docket No. 20, Ex. C.

[14] *Id.* at § 3.2(vii).

[15] *Id.* at § 3.2(vi).

[16] *Id.* at § 4.1.

PTC the full cost of such audit."[17]

Further, the 2005 License Agreement includes a "Reporting" clause as follows:

> Upon written request from PTC, Customer agrees to provide to PTC and installation and/or usage report with respect to the Licensed Products . . . . Such report shall be certified by an authorized representative of the Customer to its accuracy within ten (10) business days after receipt of such written request from PTC."[18]

**C. PTC's Clickwrap Agreement**

Before installing the Pro/ENGINEER Software, potential users must acknowledge certain legal notices and indicate that they agree to a standard PTC Customer Agreement (the "PTC Clickwrap Agreement") by clicking an "I ACCEPT" button shown on the computer display.[19]

The legal notice in the PTC Clickwrap Agreement provides:

> IF CUSTOMER DID NOT OBTAIN THE LICENSED PRODUCT FROM PTC DIRECTLY . . . CUSTOMER IS USING AN ILLEGALLY OBTAINED UNLICENSED VERSION OF THE APPLICABLE LICENSED PRODUCT. PTC REGARDS SOFTWARE PIRACY AS THE CRIME IT IS AND PURSUES (BOTH CIVILLY AND CRIMINALLY) THOSE WHO TAKE PART IN HESE ACTIVITIES. AS PART OF THESE EFFORTS, PTC UTILIZES DATA MONITORING AND SCOURING TECHNOLOGIES TO OBTAIN AND TRANSMIT TO PTC DATA ON USERS OF ILLEGAL COPIES OF LICENSED PRODUCTS . . . . BY USING THIS SOFTWARE, YOU CONSENT TO THE COLLECTION, USE, AND TRANSFER OF PERSONAL DATA (INCLUDING TO THE UNITED STATES) FOR THE PURPOSES OF IDENTIFYING USERS OF ILLEGAL COPIES OF OUR SOFTWARE. SUCH CONSENT SHALL BE BINDING ON ANY USERS OF THIS SOFTWARE, INCLUDING USERS OTHER THAN YOU.[20]

The PTC Clickwrap Agreement also provides that "[i]f Customer uses any unlicensed or unauthorized copies of any PTC software, Customer agrees that . . . Customer will pay to PTC the PTC then-current list price for all such unlicensed software, in addition to any fines or penalties that may be imposed by law."[21] Further, the PTC Clickwrap Agreement states that "[t]o confirm Customer's compliance with the terms and conditions hereof, Customer agrees that PTC may

---

[17] *Id.*

[18] *Id.* at § 4.2.

[19] *See* Docket No. 20 ¶ 7.

[20] Docket No. 20, Ex. D.

[21] *Id.* at § 1.4.

perform a usage assessment with respect to Customer's use of the Licensed Products. Customer agrees to provide PTC access to Customer's facilities and computer systems . . . as reasonably requested by PTC in order to perform such assessment."[22]

**D. PTC informs Flextronics of unauthorized versions on Flextronics' systems**

On July 26, 2012, Jason Swan ("Swan") of PTC contacted Dave DeForest ("DeForest"), Senior Director of Global IT, Compliance and Policy Management for Flextronics, claiming that PTC had discovered evidence of unauthorized versions of PTC software in Flextronics' computer system.[23] Swan forwarded certain data that PTC disclosed it had "accumulated" relating to alleged illegal use of PTC software by Flextronics.[24] DeForest responded the same day asking for further information to explain the report and "specifically inquiring as to how Mr. Swan or PTC obtained any information from Flextronics' computers and/or computer systems."[25]

In response, Swan informed DeForest that PTC's Pro/Engineer software, which Flextronics uses, contains "embedded technology that will initiate a push of information to a PTC server where the data is captured in a database."[26] He also informed DeForest that "PTC maintains a strict policy of only initiating this process if and when a license file is altered."[27]

**E. Flextronics investigates its computer systems**

DeForest proceeded to investigate the validity of PTC's claim that Flextronics had illegally

---

[22] *Id.* at § 2.1.

[23] *See* Docket No. 36-1, Ex. A.

[24] *See id.*

[25] Docket No. 36 ¶ 5.

[26] *Id.*, Ex. C.

[27] *Id.*

United States District Court
For the Northern District of California

used PTC software.[28] On September 21, 2012, DeForest informed PTC by email that "[w]e are continuing to run the network inventory and are currently at 71% of the machine population. This has produced 11 'cracked' versions found so far."[29]

PTC also provided Flextronics with a "protocol" to investigate Flextronics' computers for instances of illegal software use by physically accessing the computers.[30] When DeForest employed this "protocol," he narrowed his finding to nine potentially unauthorized copies of PTC software.[31] On October 22, 2012, DeForest informed PTC by email that "[o]ur review of Asia, using our crawler technologies and some revised scripts to identify potential unauthorized installations, turned up [nine] unauthorized installations in our Asia sites."[32] DeForest forwarded a spreadsheet supporting this assessment.[33]

On November 6, 2012, PTC wrote to Flextronics to express concern that Flextronics' creation, possession, and use of unauthorized copies of PTC software had actually increased since PTC first brought the issue to Flextronics' attention in July 2012.[34] On November 9, 2012, PTC provided a spreadsheet of Flextronics machines suspected of containing pirated copies of PTC software, and identified each by host name.[35] That same day, DeForest informed PTC that "[t]his matter has been referred to the attention of our Corporate Legal staff."[36] DeForest also asked

---

[28] *See* Docket No. 36 ¶ 7.

[29] Docket No. 21, Ex. A; *see also* Docket No. 36 ¶ 10.

[30] *See* Docket No. 36 ¶ 11.

[31] *See id.*

[32] Docket No. 21, Ex. B.

[33] *See* Docket No. 86.

[34] *See* Docket No. 20 ¶ 9.

[35] *See* Docket No. 87, Ex. 6.

[36] Docket No. 86.

United States District Court
For the Northern District of California

Armin Jaeger ("Jaeger"), a member of the Flextronics Inventory Service in Austria, to have a "quick look" at the spreadsheet provided by PTC.[37]

On November 26, 2012, Flextronics demanded that PTC "cease and desist" from "accessing" Flextronics' computer systems, and dismissed its admitted creation, possession, and use of "cracked" copies of PTC software as "de minimis, at worst."[38] On November 29, 2012, PTC responded, assuring Flextronics that PTC does not access or monitor any customer computer systems and accepting Flextronics' offer to investigate on a cooperative basis the possible "cracked" copies of PTC software.[39]

On December 6, 2012, Jaeger sent DeForest two spreadsheets that showed 11 copies of PTC software with invalid serial numbers such as 8888888 or 12345678.[40] Nevertheless, on December 14, 2012 DeForest sent an email to PTC stating that "we are coming up empty" and that "we only find one machine with PTC software from the list you gave us."[41]

On January 3, 2013, Flextronics filed this suit against PTC, asserting a Computer Fraud and Abuse Act ("CFAA") claim and declaratory judgment that it has not violated the Copyright Act or the licensing agreements between the parties.[42] In its complaint, Flextronics alleged that its investigation had revealed "at most one" infringing copy of PTC software on its computer systems.[43] PTC counterclaimed, alleging copyright infringement and breach of contract.[44]

---

[37] *See* Docket No. 87, Ex. 9.

[38] *See* Docket No. 20 ¶ 10.

[39] *See id*. at ¶ 11.

[40] *See* Docket No. 87, Ex. 9.

[41] *Id*., Ex. 10.

[42] *See* Docket No. 1.

[43] *See id.*

[44] *See* Docket No. 17.

United States District Court
For the Northern District of California

**F. PTC exercises its right to audit Flextronics' computer systems**

On January 29, 2013, PTC informed Flextronics that it would exercise its right to audit Flextronics' computer systems, and requested an installation/usage report pursuant to Section 4.2 of the 2005 License Agreement.[45] On January 31, 2013, Flextronics completed a review of its computer systems to identify all uses of PTC software and confirm corresponding licenses.[46] The report identified 857 copies of PTC software that used a "corporate license," 104 copies of PTC software that it characterized as using a "non-corporate license" and two "cracked keys."[47] According to an email exchange between DeForest and another Flextronics employee, "using corporate license" meant that "the user has a paid license that we have a contract to cover."[48] "Using a non-corporate license" meant that Flextronics would "not be able to identify the license details until the site IT or individual provides the purchase proof."[49] Flextronics' report was not certified by any authorized Flextronics representative.[50]

On February 2, 2013, PTC demanded that Flextronics audit all Flextronics sites "simultaneously;" Flextronics informed PTC that Flextronics maintains 60 installations located in 60 countries.[51] On March 22, 2013, PTC provided a written proposal from Ernst & Young describing a more limited audit of Flextronics' use of PTC software.[52]

On or about March 28, 2013, Flextronics modified its Flextronics Inventory System Tool

---

[45] *See* Docket No. 20 ¶ 11.

[46] *See* Docket No. 90 ¶ 8.

[47] *See* Docket No. 87, Ex. 12.

[48] *Id.*

[49] *Id.*

[50] *See* Docket No. 20 ¶ 15.

[51] *See* Docket No. 39 ¶ 3.

[52] *See id.*, Ex. B.

United States District Court
For the Northern District of California

and conducted a scan of its computer systems.[53] The scan identified 128 unique Flextronics machines in the Asian region where PTC software was either installed or running, but for which no license information could be found.[54] Of these 128 machines, PTC has gathered data showing that 48 machines contained unlicensed copies of PTC software.[55] Further, PTC claims that between June 16, 2013 and July 16, 2013, PTC has received data showing 209 infringements on 55 unique Flextronics machines.[56]

## II. LEGAL STANDARDS

The decision to issue a preliminary injunction is largely within the discretion of the district court.[57] A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to such relief."[58] A prerequisite to any equitable relief, including a preliminary injunction, is that legal remedies would be inadequate.[59] A plaintiff seeking preliminary injunctive relief must demonstrate (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary injunctive relief, (3) that the balance of equities weighs in his favor, and (4) that an injunction is in the public interest.[60]

---

[53] *See* Docket No. 87, Ex. 13.

[54] *See id.*

[55] *See* Docket No. 88 ¶ 6.

[56] *See id.*

[57] *See Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009).

[58] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[59] *Cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies").

[60] *Id.* at 20; *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

*Winter* "did not alter [the district court's] ability to balance the elements of the preliminary injunction test, so long as a certain threshold showing is made on each factor."[61]

## III. DISCUSSION

### A. Likelihood of Success on the Merits

PTC contends it is likely to succeed on both its copyright infringement and breach of contract claims. A claim for software copyright infringement requires the plaintiff to demonstrate: (1) ownership of a valid copyright in the software alleged to have been copied, and (2) actual copying of the protected software.[62] A certificate of registration of the software is "prima facie evidence of the validity of the copyright and the facts stated in the certificate."[63] "A licensee infringes the owner's copyright if its use exceeds the scope of its license."[64]

Since PTC notified Flextronics on July 26, 2012 that it detected unauthorized copies of PTC software on Flextronics' systems, Flextronics has admitted the same – the only difference in the two parties' viewpoints is the extent of the unauthorized use. At various times, Flextronics has admitted that it has "11 'cracked' versions" of PTC software,[65] admitted that it detected "9 unauthorized installations" in Flextronics' Asia sites,[66] and even in its complaint stated that it had "investigated PTC's claim and discovered at most one unauthorized use."[67] No matter Flextronics'

---

[61] *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).

[62] *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994)

[63] 17 U.S.C. § 410(c); *Meridian Project Sys., Inc. v. Hardin Constr. Co.* 426 F. Supp. 2d 1101, 1111 (E.D. Cal. 2006).

[64] *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989).

[65] Docket No. 21, Ex. A.

[66] Docket No. 21, Ex.B.

[67] Docket No. 1 ¶ 15.

United States District Court
For the Northern District of California

willingness to pay for it, even under Flextronics' litigation stance, Flextronics has copied PTC software in a way that exceeds the scope of its licensing agreement.[68]

On this record, the court finds that it is likely that PTC will succeed in proving that Flextronics engaged in unauthorized copying of PTC software. As an initial matter, Flextronics has not provided a satisfactory explanation for why its count of unauthorized copies is ever-shifting. In January 2012, Flextronics' own scan reported 104 copies of PTC software that it was not able to match with valid licensing information, along with two confirmed "cracked keys."[69] In March 2013, Flextronics' scan found 128 copies for which it could not locate legitimate licensing information.[70] To the court's knowledge, Flextronics to this date still has not provided legitimate licensing information for these copies. Yet Flextronics maintains that it has only identified one unauthorized version of PTC software, purportedly based on the two-step method proposed by PTC of first locating copies without proper licensing information and then searching those copies for "crack" in the file name. As a Flextronics manager acknowledged internally, this procedure is unlikely to yield all unauthorized copies:

> However the way PTC wants us to scan, according to their procedure, is somewhat useless. Well if I crack something i.e. (I am of course never do that at my home computer ☺ ) I always remove the crack folder or files having a reference to that.[71]

---

[68] Flextronics dismisses its infringement as *de minimis* and therefore unworthy of granting injunctive relief. But the *de minimis* doctrine does not give the infringing party a free pass if it made only a few unlicensed copies of copyrighted software. The doctrine instead concerns the extent of the copying of the protected work, providing that "even where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial." *Newton v. Diamond*, 388 F.3d 1189, 1192-93 (9th Cir. 2004) (ruling that three-note sample was *de minimis* and so defendant's use was not actionable." By contrast, Flextronics admits that its employees created complete copies of PTC's software, placing these copies well outside of the *de minimis* doctrine. *See, e.g.*, *Brocade Commc'ns Sys. v. A10 Networks, Inc.*, Case No. 10-3428 PSG, 2013 WL 831528, at *8 (N.D. Cal. Jan 10, 2013) (holding that the copying of 145 lines of copyrighted software code "provided substantial evidence that [defendant's] actions exceeded merely *de minimis* copying of the code").

[69] *See* Docket No. 87, Ex. 12.

[70] *See* Docket No. 87, Ex. 13.

[71] Docket No. 87, Ex. 2.

United States District Court
For the Northern District of California

Flextronics seems content to depend on only those copies that are proven to be cracked, rather than investigate further into copies that have no legitimate licensing information on file. Even if the court were to accept this continuing gap between copies confirmed to be "cracked" and copies Flextronics considers "innocent until proven guilty," at least some copyright infringement appears likely to be shown.

PTC also argues that it is likely to succeed at trial on the merits of its breach of contract claims. To prove breach of contract, the plaintiff must show the existence of a contractual obligation, the occurrence of any conditions precedent to that obligation (including plaintiff's performance or excuse for nonperformance), the breach of the obligation, and resulting damages.[72] Aside from Flextronics' admitted copyright infringement, PTC argues that Flextronics also breached the "Reporting" and "Audit Right" clauses of their contract. PTC invoked both rights in early 2013. While Flextronics responded to the "Reporting" request with installation/usage information, it plainly has not certified these results, as it is obligated under the licensing agreements to do.[73] As for the "Audit Right" clause, it requires that Flextronics provide PTC access to its systems and the cooperation of its employees "as reasonably requested by PTC" to allow PTC to perform an audit of Flextronics' systems.[74] Flextronics refused to allow the simultaneous audit proposed by PTC, arguing it is unreasonable. The court lacks information at this time to determine whether the simultaneous audit is reasonable or not under the terms of the contract, but what is clear is that no audit whatsoever has yet occurred. Flextronics at least has an

---

[72] See *FPI Dev., Inc. v. Nakashima*, 231 Cal. App. 3d 367, 383 (Ct. App. 1991); *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

[73] *See* Docket No. 19 at 8.

[74] Docket No. 20, Ex. C § 4.1.

ongoing duty to work with PTC on conducting a reasonable audit of its systems.[75] This it simply has not done.

**B. Irreparable Harm**

PTC contends that it will suffer irreparable harm if no injunction issues. Merely proving a likelihood of copyright infringement no longer creates a presumption that irreparable harm will ensue.[76] Here, Flextronics and PTC are not competitors, nor is there evidence that Flextronics copied PTC software for the purposes of selling or distributing to others.[77] But even as it concedes its claim might ultimately be reduced to a money judgment, PTC nevertheless urges that "because of the ever-changing number of cracked copies that Flextronics acknowledges to have made, PTC will suffer irreparable harm if that judgment cannot be quantified because all infringing copies of PTC software are not preserved and cannot be accounted for."[78] Put another way, if Flextronics employees remove evidence of unauthorized copies before a full trial on the merits can be had, PTC would not be able to recover damages for the discrepant amount.[79]

---

[75] Despite its representation that it has cooperated with PTC in resolving this dispute, Flextronics has not always been forthcoming. In fact, when Flextronics offered to purchase two licenses from PTC, Flextronics attempted to obfuscate its liability by instructing its employee not to tell PTC that the payment was "to correct the compliance issue. Just tell them 'we believe we owe them for 2 ProE licenses.'" Docket No. 87, Ex. 14.

[76] *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) ("Thus, our long-standing precedent finding a plaintiff entitled to a presumption of irreparable harm on a showing of likelihood of success on the merits in a copyright infringement case, as stated in *Elvis Presley* and relied on by the district court, has been effectively overruled. In other words, "*Elvis* has left the building."). *See also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (establishing that patent infringement actions are not exempt from the four-factor preliminary injunction test, including the requirement that the plaintiff show irreparable injury).

[77] *Cf. Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 828 (9th Cir. 1997).

[78] Docket No. 19 at 8-9.

[79] *Cf. Shutterfly, Inc. v. ForeverArts, Inc.*, Case No. CR 12–3671 SI, 2012 WL 2911887, at *3 (N.D. Cal. 2012) (issuing temporary restraining order where plaintiff was likely to suffer irreparable harm in the absence of a TRO if defendants deleted or destroyed crucial evidence); *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (holding that the purpose of

Flextronics responds that it has been on litigation hold since December 21, 2012, and continues to preserve all documents and electronic files related to the dispute.[80]

While the court does not disparage in any way the representations of counsel, Flextronics' employees have acknowledged internally that they easily can remove evidence of "cracked" files. The ease with which Flextronics' employees may be able to erase evidence of infringing copies, with or without Flextronics' knowledge, is, to say the least, troubling. The court therefore is not persuaded that the irreparable harm PTC faces is speculative or remote, and that a mere promise to preserve all documents is sufficient to preserve PTC's remedies following a full trial. The court also must note that PTC has audit rights that have yet to be fulfilled. The audit rights protect against the same irreparable harm identified by PTC in its papers – the chance to locate and account for infringing copies before engaging in lengthy and expensive litigation. As made clear by the parties' history of engagement since July 2012, the number of infringing copies identified is constantly in flux. Add to that the ease with which employees may delete infringing copies, and the likelihood that copies will go unaccounted for becomes more than speculative. The "Audit Rights" clause was designed to prevent this kind of harm: as the contract acknowledges, the "Customer's breach of any of its obligations under Section 4 or 5 will irreparably harm PTC . . . and substantially diminish the value of the proprietary rights in the Licensed Products" and PTC shall "be entitled to equitable relief (including, but not limited to, injunctive relief) to enforce Customer's obligations and to protect the proprietary rights of PTC and/or its licenses."[81] While the court does not rely exclusively on this clause to find irreparable harm,[82] the clause does support

---

a preliminary injunction is to "preserve the status quo and the rights of the parties until a final judgment issues" in the case).

[80] *See* Docket No. 89 at 5.

[81] Docket No. 1, Ex. A § 13.

PTC's contention that the parties recognized the difficulty of keeping track of unauthorized copies and built in the "Reporting" and "Audit Rights" clauses to address that concern. Time is the main concern of these rights – the aim appears to be to give PTC the chance to determine the number of infringing copies before engaging in extensive litigation and as soon as possible, before any spoiliation can occur. Such rights would inevitably be meaningless by the end of litigation.

**C. Balancing of the Equities**

PTC argues that Flextronics knowingly infringed PTC's copyright, and so the balance of equities tips sharply in PTC's favor. Flextronics in turn accuses PTC of coming to equity with unclean hands because it has used unauthorized "phone home" technology to track Flextronics' systems.

The court does not find either party's finger-pointing particularly compelling. Balancing of the equities is not necessarily an assessment of who is more righteous, but rather an assessment of how the issuance or nonissuance of a preliminary injunction will affect the parties.[83] If no injunction is issued, and PTC ultimately prevails, it is probable that PTC will not be in a position to

---

[82] Contractual language alleging breach of the contract would cause irreparable harm, or that money damages would be inadequate, standing alone, is not enough to satisfy the irreparable harm requirement. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (reversing grant of preliminary injunction because district court improperly relied on exclusivity clause despite plaintiff's "inability to show any threat to its existence, damage to its goodwill, loss of customers, or loss of its competitive position in the market"); *Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate"); *Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc.*, Case No. 209-CV-00023-MCE-GGH, 2009 WL 805813 (E.D. Cal. Mar. 26, 2009). *See also Int'l Ass'n of Plumbing & Mech. Officials v. Int'l Conference of Bldg. Officials*, 79 F.3d 1153 (9th Cir. 1996) (unpublished Ninth Circuit opinion reversing district court's reliance on EULA provision to find irreparable harm because court was not aware of "any authority which allows a petitioner seeking injunctive relief to meet its burden on the issue of irreparable injury *solely* by referring to such a contractual provision").

[83] *Winter*, 555 U.S. at 24 (balancing of the equities requires the district court to consider the "competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief").

secure all the money damages it will be due. On the other hand, if an injunction is issued and Flextronics is ultimately found to be in the right, the burden on Flextronics of immediately complying with a reasonable audit procedure may be time-consuming and costly, but not unwarranted. After all, in a negotiated contract between two sophisticated businesses, that audit right is exactly what Flextronics agreed to.

**D. Public Interest**

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[84] The public interest is not strongly implicated in this case, beyond generalized public policy interests in seeing legitimate contracts enforced and preventing copyright infringement.[85] This factor thus mirrors the likelihood of success and irreparable harm factors, and so the court does not repeat those concerns here.

**E. Remedy**

Considering that PTC has demonstrated a likelihood of success on the merits of both its copyright infringement and breach of contract claims, as well as a probability of irreparable harm, and adequate showings on balancing of the equities and the public interest, the court finds that a narrowly-tailored preliminary injunction is warranted. Some of the mandatory injunctive provisions proposed by PTC, however, go too far – an injunction requiring Flextronics within 30 days to affirmatively serve on the court a written report of its compliance is disproportionate and burdensome on Flextronics in light of the parties' contract and the irreparable harm alleged. The court nevertheless finds that Flextronics has no legitimate interest in ongoing copyright

---

[84] *Id.*

[85] "Since Congress has elected to grant exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Apple Computer v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (quotation omitted).

United States District Court
For the Northern District of California

infringement,[86] and should be obliged to cooperate in good faith with PTC in resolving this dispute, as required by the terms of the contract.[87] Accordingly, the court alters the preliminary injunction provisions proposed by PTC to address these concerns.

## IV. CONCLUSION

Plaintiffs Flextronics International, Ltd. and Flextronics International USA, Inc. (collectively, "Flextronics") and their officers, agents, servants, employees, attorneys, and all persons acting in concert with them:

(a) Are enjoined from copying (including downloading from a website or digital storage media), distributing, making derivative works from, or using PTC's copyrighted software except as allowed by the contract or by express written license from PTC;

(b) Are enjoined from destroying any current, active, or archived copies of PTC software until after it has taken steps to preserve such evidence; and

(c) Shall not interfere with PTC's right to a reasonable audit of Flextronics' computer systems under the terms of the contract.

**IT IS SO ORDERED.**

Dated: September 16, 2013

PAUL S. GREWAL
United States Magistrate Judge

[86] Flextronics acknowledges it cannot have any legitimate interest in ongoing copyright infringement. *See* Docket No. 57-1 at 2.

[87] Flextronics argues that a simple remote audit, or Software Asset Management ("SAM"), would be effective in identifying infringing copies and is commonly used by other members of the industry. *See* Docket No. 57-2. The parties have not provided enough information for the court to dictate what procedure would be "reasonable." Nevertheless, the parties are encouraged to meet and confer to determine what process would be most effective under the terms of the contract. If they are unable to agree, they may return to this court for an order on what is or is not reasonable – but in the very different context of a motion for contempt.